13-30390. Is the appellant ready to proceed? Appellee? You may proceed. May it please the court. I'm Mike Fowler. I am representing Ms. Thompson here at the appellate level just as I did in the case. There are two very disparate issues in this case. First, we've raised the legal sufficiency of the evidence to convict Ms. Thompson of conspiracy to commit health care fraud, substantive violation of health care fraud, and receipt of kickbacks from Psalm 23, the distributing organization. The second issue in the case, the court's failure to instruct the jury on Ms. Thompson's, as I wish to focus my attention on the latter, because the sufficiency issue in this factually intense case requires a careful review of the trial record, just as this court did earlier this year in reversing a quite similar health care fraud conviction in the Ganji case, U.S. v. Ganji. But the trial court's refusal to instruct a jury on my preferred theory of the defense calls for a very different analysis. As I understand it, in every criminal case, there are by necessity divergent factually based theories of guilt and innocence. The government's theory, as in this case, was set forth in a factually elaborate 16-page indictment. That indictment was read to the jury at the outset of voir dire, described in detail in the court's instructions, and sent with all the exhibits to the jury for their use in, during deliberations, as was the court's instructions in written form. Nothing, absolute nothing, in the court in this matter, excuse me, nothing in the latter, the court's instructions, mentioned the defendant's theory of defense. If... But very generally, aren't the instructions... I'm sorry, Judge. Aren't the instructions supposed to be instructions on what the law is in the case? Not just the law, because the court, you have legal instructions, and then you have the reading of the indictment, which is the fact, government's factual theory of the case. And it's been recognized, as I will demonstrate, by this court, by fact, by a sitting member of this court. In any event, if we insist as a matter of due process, a jury be given a balanced view of the case, then an evidentiary and I emphasize that word, an evidentiary theory of the defense, just like the by the trial judge in his instructions. Forty years ago... It seems to me the instruction... Yes, Judge Willard, I'm sorry. It seems to me the instruction the court ultimately gave the jury was just a more concise version of the one you proposed. I would take strong issue with that. There's not a word of what I suggested in those The court again and again instructed on the factual factors in the indictment, never ever alluding to what was my profit of the profit theory of the defense. And that proffer of the defense is document 322, found at the record on appeal at 3589. If I may, 40 years ago, Chief Judge Brown in U.S. v. Barham set forth the applicable standard. What did he say? He said where there is any evidentiary support whatsoever, not my language, his, whatsoever, for the availability of a legal defense and the trial court's attention is specifically directed to that defense, it is reversible error for the court to refuse to charge the jury concerning that defense. Moreover, the instructions must be sufficiently precise and specific to enable the jury to recognize and understand the defense theory tested against the evidence presented at trial and then make a definitive decision whether, based on that evidence, in light of the defense theory, the defendant is to present your defense theory through evidence, through testimony, through a closing argument. If I understand, Your Honor, I'm sorry, we're hearing a, could you just repeat yourself? Putting aside the instruction the district court gave, were you able to present your theory to the jury via testimony, cross-examination, closing argument? That doesn't answer the question as Judge Higginbottom described it, as he well knows, which I'll come to in one minute. The difference is the articulation by the judge. That's what we're calling about, talking about. The judge again and again tells the jury about the governance theory and the court, this Fifth Circuit has said since 1969, as far as I can see, that the theory, that if there's an evidentiary support for the defense theory, the judge must articulate it. And in a minute, I'll describe why Judge Higginbottom, in no uncertain terms, with the phrase emphasis added, made that clear in the Fulardi case. Well, don't keep us in suspense. What did Judge Higginbottom say? I'm sorry? Don't keep us in suspense. What did Judge Higginbottom say? Well, I . . . You don't have to ask me. You can just ask Judge Higginbottom. I won't . . . I don't get to ask him questions, so he's asking you. I got it as much. All right. Judge . . . What was said then by Judge Higginbottom, and by the way, that there is no issue in the Hill case, which is another case decided by this Court per curiam, it was clear that it has to be a fact. The Court is to, quote, define with substantial particularity the factual elements of the defense. Factual. And that was . . . that's what's critical. But let's come then to what Judge Higginbottom had to say. After acknowledging the standard as I've set it out, these are his words, and I quote them. We add the caution because the trial judge's imprimatur on a defendant's theory is important. As the source of the law and the only neutral figure before the jury, his words are potent. And then he added, that reality drives the idea that a defensive theory is best expressed by the judge, and the phrase expressed by the judge is highlighted by the writer of that opinion in this case . . . in that case. And that is precisely what's demanded in a criminal case. It is not enough. I've tried enough criminal cases where again and again you have the government's theory, which is factually set forth in the indictment. But it's never . . . but then there's . . . unless requested, and by the way, I have any number of judges in the Eastern District and others who've given theories of defense. And at times you will submit a theory of defense and the judge says, your first two paragraphs are fine, your third paragraph I won't charge. But to simply wholeheartedly, just across the board, say, oh, no, you . . . that's . . . you . . . it sounds like what you want to do is have me tell the jury what you could argue, in summation. And the judge at that point offered to me . . . what he then offered, if I may just . . . left out the note. He said, in the . . . in this case, I submitted what I consent is an absolutely objective, factually based theory of defense, which the judge rejected on the ground that it included contested statements of fact. I mean, it would all do . . . of course it did. The indictment is loaded with contested statements of fact. That's why we go to trial. And I . . . what was my response when the judge said that, quote, so are all the allegations of the indictment. And I offered a theory of defense which is part of the record and I just cited where it is. It's three paragraphs, three substantive paragraphs. And I defy anyone to show me where there is not substantive evidence supporting what I say. It's done in a non-objective, non-argumentative way. And I had a right to have it go to the jury that way. What the judge offered was nothing more than, say, what we dealt with at arraignment. We had pled not guilty. And all he's saying is my theory of defense is that defendant says she's not guilty. That doesn't cut it. This jury deliberated with the judge's repeated articulation of the government's factual theory of guilt, but had before it no judicial acknowledgment. And I emphasize that again. The whole . . . what I'm talking about here is it's unimportant how great a as just what the judge does with the indictment. The judge needs to acknowledge the legitimacy of my defense. It's . . . he's not saying you must accept it. He's saying this is what is legitimately being put forth by counsel for the defendant. And when that's not done, you don't have an even playing field. And the jury goes into the jury room with a factual assertion in the indictment, nothing, nothing concerning the defense theory of the case. Let me make one other point where I take issue, frankly, with Judge Higginbottom. He noted in that opinion, in foolhardy, that it's not exactly . . . this court has not exactly painted a straight line in the issue that I've raised. And he said during the course of his decision, and I acknowledge it's obviously there, that in assessing . . . let me read it so I don't I beg the court's pardon. What Judge Higginbottom said, to determine whether the trial court's failure to give a requested jury instruction violates a defendant's right to the fair trial guaranteed him by the due process clause of the Fifth and Fourteenth Amendment, the charge must be examined in the full context of trial, including the final arguments of counsel. It's those last four words that I take tremendous objection to. As much as I respect the judge that wrote those, it makes no . . . what difference does it make how well I do on making my argument if the judge has not acknowledged its validity as he had with respect to the indictment? It's not a very complex issue, and as Judge Higginbottom points out, the court has, at various times, made statements like, well, you've got to include the final argument. Why? What has that got to do with the judge putting his imprimatur on it, as this court has said through Judge Barham and through Judge Higginbottom? Counsel, do you want to spend . . . you have a couple of minutes left. Do you want to spend any time talking about your sufficiency of the evidence? No. I mean, unless the court has some questions. Don't get me wrong. I think we have a very strong issue on sufficiency, but I don't think I can help you much on oral argument. I think you have to do what you did in Ganji, in a very well-articulated opinion in Ganji, is read and but I don't think I can add to it in oral argument as I think I can on the theory of the defense issue. That substantive sufficiency issue, you know, I think is something you alone can deal with by looking at the trial record and seeing if the government met its burden of proof. The trial record, I suggest, is not . . . you don't have the same analysis in making a court's charge in this case. It's as simple as that. The only thing I'd say, it's . . . I submit to your honors, as the panel that is controlling in this case right now, it's time for this court, in no uncertain terms, to specifically instruct the lower courts that in a criminal case they must, when requested to do so, define with substantial particularity the factual preface of defendant's theory of defense. And unless the court has some questions at this point, I'll save my remaining time for rebuttal. Thank you, counsel. Good afternoon. May it please the court. Joanna Bowman for the United States. I'd first like to begin by addressing my colleague's statements regarding the defendant's theory of the defense. The district court did not abuse its discretion here. As the district court made clear, the statement was paragraphs of closing argument containing contested facts. And indeed, the court proposed an alternative statement, which defense counsel rejected as giving the jury without anything to back it up. And indeed, that statement said, Ms. Sandra Parkman denies she conspired with anyone at Psalms 23 to knowingly violate any federal law, nor did she knowingly join in any such conspiracy. As to all counts, she contends she did not act with the knowledge that her conduct was unlawful. And the very issue that defense counsel raises is that the heart of Ms. Parkman's defense was that she did not knowingly violate any health care fraud statute, or she did not knowingly conspire to do so. But the very statement that the district court proposed addresses that very issue. And as the district court made clear, further, as this court has made clear, there's no abuse of discretion or refusing instruction when the defense can argue good faith to the jury and the jury instructions amply cover the men's ray. And here, the defense counsel made every single argument to the jury regarding the contested facts, such that she never asked Dr. Jase to sign a blank form, that she never filled in any time any information on the forms provided to Dr. Jase, and that Dr. Jase never told her that he was, in fact, examining a patient. And also, the jury instructions for knowingly, willfully, and deliberate ignorance amply covered her defense. Counsel, let me ask you, if I might, assuming that what the trial judge did is legally sound, what's wrong with Mr. Fowler's argument that the judge should go to the jury with the imprimatur of the trial judge itself? In the real world of trials, that is a reality, to my experience. What's wrong with the other side? What's wrong with it? I'm not talking about the law. It only takes the judge a few more minutes to do this, and it took more time to not do it. So my question is, what's wrong with that? We're trying to do the best we can. If you accept the words from the judge, do carry weight, and that that is the most pusant figure in the courtroom. Well, the district court could have chosen to give the instruction, but it declined to do so. I understand that. My question to you is, what's wrong with asking the district judges to do a little more than just cut it off and give the border plate, because the border plate comes from the government and the indictment. There's nothing wrong in asking the new district court to do more, but the court does not have to do so. And I think it's important to note that the issue... Did you object to them doing it? The government did object, yes. So you didn't want him to do it? No. Why? We believe the instructions for knowingly and willfully and deliberate ignorance carried amply covered the defense here. That was the issue that Ms. Parkman was raising throughout her trials, that she argued that she did not knowingly conspire to pay kickback. She did not knowingly participate in the health care fraud conspiracy, and she did not knowingly participate in the substantive schemes and kickback counts. Were you the trial counsel? I was not. And I think it's important to note that the United States, when stalling these in 2018, requested... Found only reverse... Stated that there's only reversible error. The requested instruction is subsequently correct. It's not covered in the jury's charge, and concerns an important part in trial. And I don't think that the defendant was impaired by giving his ability to present a particular defense. He amply made those points throughout the case. In connection with that instruction, he spent some time talking about the referral fee and Ms. Parkman's belief that the acceptance of a referral fee was not illegal. What evidence did the government offer that she knew it was illegal to accept that fee? Sure. So I think a jury could have reasonably discredited Ms. Parkman's claim that she did not know that accepting kickbacks was illegal. She had a nearly 20-year career as a marketer, and a jury could reasonably expect someone practicing in his or her field would have some understanding of the requirements of her job. Yet she claims that she knew nothing about Medicare requirements. And I think it's also important to note that during the June 29, 2010 phone call that was recorded with Dr. Jase, she says to him, you know, let's get on the same page, or we... Well, counsel, I read the transcript of that phone call, and I'm going to have to She never said to him, let's get on the same page. He repeatedly said to her, we need to get on the same page. And she replied, we're on the same page. But you can take as much time as you want to look. I don't think you're going to find her saying, let's get on the same page. She agreed with him to get on the same page. And my question was, what evidence did the government offer that she knew accepting referral fee was illegal? She took it... Well, let's do it this way. She took those payments by way of a check. Isn't that right? Yes. So she was taking an illegal payment by check. But the checks were kind of irregular in nature. They were all in even amounts. They occurred sometimes days apart, sometimes weeks apart from May 2008 through one check in February 2009. That closely tracks the dates in the referral file found at Psalms 23 with Ms. Parkman's name. It has her name and cell phone number. That referral file contained information of her own family members, her mother, her sister-in-law, her ex-husband, and her cousin. And three of those family members are individuals she referred for kickbacks in the month of May, in May 2008. In addition, she told the agents during the July 2010 interview that she gave some prospective patients beer in exchange for their information. Well, counsel, when she was interviewed, she sat down showing absolutely no fear or fright of having an FBI agent or an agent of the government drop a badge on them and talk freely about what she did. And that's either the product of a very criminal enterprise or someone who drew strong evidence that she didn't think that what she was doing was wrong. I think it's important to note that that interview occurred after her phone call with Dr. Jase. The phone call with Dr. Jase occurred June 29, 2010, and her interview with the agent occurred in July 2010. So at the time of the interview, she knew that investigators were speaking with them. She also knew, based on her conversation with Dr. Jase, how much investigators knew that she earned $500 for power wheelchairs, $300 for patients who received arthritis kits. They knew that she worked at Psalms 23, that she knew that she had obtained Dr. Jase's signature for nearly 70 patients, and that she knew she worked with other patients. And I think the one thing the phone call says is, you know, she, like you mentioned, she agreed to and I think, you know, it's important to note at the end of the interview, and you can find this at record number 1543, she stated, I may have done some things because I was told how to operate people's businesses, but I was not 100% wrong. And I think the jury can Well, so let me stop you, counsel. See if you can agree with me that she could know that falsifying medical evidence in order to get these people qualified for these devices. You can agree with me that she could know that that was wrong. So she gets the people to sign up. But then once she makes the referral, and she gets the fee, my question is, what evidence is there that she knew that it was wrong to accept the fee for making the referral? In other words, you can falsify documents, so that you have someone who qualifies for the equipment, when in fact, they don't qualify. But then she and then they pay her a fee for every referral. What I didn't see was evidence that she knew it was illegal to accept the fee by way of a check, which he had to take to a bank and deposit these kickbacks. Then she reported her kickbacks to the IRS, didn't she? These fees she reported as income to the IRS. Well, I will, I would like to point to what the 11th Circuit said in the United States be so sad, giving or taking a kickbacks for medical referrals is really the sort of activity a person might expect to be legal. And I think, you know, she was recruiting patients for two specific items, power wheelchairs and arthritis kits. Those are the two items Psalms 23 was billing Medicare, and those were the two items for which she received kickback. And I would also note that after marketing for Psalms 23, after she was indicted in the Lobdale case, and after she was aware of the investigation into Psalm 23, she went to work as a marketer at Comprehensive Home and I think it's important to note this because at trial she said, well, I was indicted at that point, but I knew, so I knew I couldn't be a marketer, but she acted as a marketer anywhere anyway. And Erica Joseph, the Comprehensive employee, even though testified that she was the owner of Comprehensive, directed her to write on the, on the patient checks that Parkman received, patient education of XYZ patient. And I think that's, you know, that's Ms. Parkman apparently at least was on notice, definitive notice at the time she was indicted and aware of invest, that these investigations were going on, that paying kickbacks was illegal, but she continued to do so because she wanted the money. So she knew it. What's the evidence again? Because somebody told her to put something on the box on the chair. So she claimed at trial that the owner of Comprehensive, I believe it was the owner of Comprehensive Home Health, told her that being an in-house marketer was legal. And she stated, I knew I couldn't be a marketer because I was indicted at that point. She'd been indicted in the, in the Lobdell case. I think she was indicted in July, 2010 at that point. And she was aware, but she was receiving checks throughout the court that I think the seven or eight checks, I don't recall the exact number, but this is a government exhibit, exhibit seven, where the checks say patient education of XYZ patient. And I think, as Erica Joseph testified, the owner of Comprehensive directed her to make that statement to mask the fact that these were kickback payments. So the fact that Ms. Parkman continued to do that, even after she was on definitive notice, shows that she has complete disregard and does not care that she's knowingly violate, violating the kickback statute. Um, unless the court has any further questions, the government rests. We ask that you affirm, affirm Ms. Parkman's convictions. Thank you, counsel. Rebuttal. Your argument sort of demonstrates the very issue, the problem with failure to do the, to submit the theory of defense to the lips of the judge. What I submitted, and I don't think it's useful because your honors can read it as well as I do. We articulated just the two issues you raised, the lack of knowledge, or put another way, the aware, the, from her point of view, that being a marketer was okay. There were tens and tens of a lot of people, hundreds perhaps, who in the community during the day, that decade, were acting as marketers. And not because I say so, but because the governments, the witnesses, Lisa Crinnell from Comprehensive, Dr. Crear, there was a series of other companies she worked for. Nobody ever suggested there was any problem. Nobody gave her any rules or regulations with respect to it. And even the government's own witness said, while it would be expected that the owner of a company, a distributor like Psalm 23, or Lovedale would know the rules and regs, there's nothing to suggest that someone who acting in the capacity that Sandra Thompson did would know them. What you have is a total, what the government basically has here is this call that's been referred to, which is a meaningless call in terms of evidence in this case. What we're saying is, again, if you accept everything opposing counselors say, it still was their theory, harsh speculation, governments insinuations and speculations contained in the indictment are before the jury and read to the jury and included in the instructions. But that same, our response to those issues, the lack of knowledge, her agreement with Dr. Jase was picked out by her because he agreed to do home visits. And he agreed to see these patients. And she had, there's not a scintilla of evidence in this record that undermined his testimony on cross-examination, that he had a specific understanding with her that he would see patients. He didn't do so, and she didn't know it. She would bring the patient or send the patient to Dr. Jase if they didn't have their own doctor. And a week or two later, she would go to see, pick up the form, the form for his having seen the patient. What she didn't know is that he was falsifying those forms. He did it in the Lubdell case. He did it here. He was, he was committing a fraud on her. She had no, there's not a bit of evidence to suggest what I just said to you isn't the factual basis of our defense in the case. Dr. Jase was, the crime was committed by Dr. Jase, not by Sondra Thompson. She was getting paid, as you say, by check. And as you acknowledge, she was reporting that money. There's nothing to suggest she had a mens rea reflecting criminality. And unless your honors have some other questions, I'll rest on what I have said. Thank you, counsel. Court will take this matter under advise.